Swint versus City of Carrollton, Georgia. May I please the court? Good morning. I'm sorry. Okay, you're you're good. Thank you, Mr. Daniels. Go ahead. Thank you, Judge Breyer. May I please the court? Good morning. My name is Harry Daniels and I represent the appellate Keelan Swint. The issue in this case is whether a city government can chill an employee's First Amendment right after the employee, who is a mandatory reporter under Georgia law, reports allegations of sexual assault of a child to their supervisor. And I think, of course, we agree the answer is no. The appellate, City of Carrollton, clearly retaliated against the appellate, a mandatory report after she reported that she was told that a possible rape allegation of rape had taken place of a child who was a volunteer for the City of Carrollton. The City of Carrollton put conditions on her employment, continuous employment, and not just that, they demoted her from a programs coordinator to a janitor and made the conditions for her son to work for the city or she work for the city. So basically, you work for the city or your son work for the city, but both of you cannot work for the city. Council, if I could focus you a little bit on what I am most concerned about. So I'm most concerned about count one related to freedom of association and whether in the light most favorable to your client, the restrictions that were put on her affected her associational rights and how that impacts the Pickering test. So your client in the letter was told that she could not have any association regarding the cultural center and that she could not have any interaction with anyone or anything dealing with pending litigation, former employees, current employees, volunteers, or anyone associated with the cultural center. Why? Tell me what evidence in the light most favorable to you in context meant that your client's associational rights were affected. In other words, her being able to interact with others on a social, political, in other words, non-employee, non-employee, non-employment basis. Thank you, Judge Luck. One of my client was a mandatory reporter. She had relationships with individuals from the Carrollton Cultural Arts Center, past and former employee. In fact, the employee that told her about the particular rape allegation was no longer an employee. She was long term friends with these individuals. She knew these individuals in community, not just in a work setting, but in a social setting as well. As I understand it, correct me if I'm wrong, as I understand it, she actually heard from that former employee over Facebook, right? She saw a notice on Facebook that the employee was no longer there and reached out on her on her individual time to see why she had left, right? That's how this all started. That's correct, because her employee was a friend. There was friends, not just in the context of coworkers, but it was actually friends, an employee put on Facebook, like you understated that she was no longer employed for the concern as concerned from her for that she would be for a friend quitting and find out what's going on. At that time, that's when she learned about the rape allegations of a particular minor. So to answer the question, this is a restriction that's not just based on the context of her job as an employee, it's a restriction for her association with her friends, people she associated, because you can see within the conditions, it talks about anybody associated with the Cultural Arts Center, not just current employees or past employees, but anybody associated Cultural Arts Center. So essentially, any volunteers, anybody who would come to the Cultural Arts Center, the city of Carrollton is not that big. So a lot of people attend the Cultural Arts Center on different things. So this is a restriction that's that's not just restriction in the context of our job, the city of Carrollton have no overarching interest based on the Pickering to say, hey, you cannot associate with these people, you cannot associate with these individuals. Can you discuss that a little bit? I admit to my ignorance of the geography of Georgia and where the city of Carrollton is. Can you just describe the city a little bit? How big is it? Where is it in relation to any other big city? The city of Carrollton is about 35 miles west of Atlanta. I'm not sure the population but I'm actually from the city of Carrollton. It's not a huge population. The University of West Georgia actually is within the city limits of Carrollton. So it's not a big place. So you're not talking about a large metropolitan city within the city of Atlanta. It is a fairly maybe about the county, maybe 80,000 seating, maybe about 20 to 30,000 people. So we're talking about a small geographical location and population. So we're talking about, you can't associate with anybody from the city, you're possibly talking about family members, I mean, the cultural art, you're talking about family members. This is a restriction that's very broad here. This is restriction is very broad. When you look at that restriction in the context of the letter, and then when you view it in the totality of the evidence, didn't her supervisor specifically tell her? It doesn't mean you can't go to lunch with people. It just means you need to stay within your own division. You don't need to concern yourself with the employment aspects of a division that you are no longer a part of. Isn't that what the what the record shows? Your Honor, I think that's a factual question. That's what the jury decides. So what was the intent for the city for the for the Is there any dispute that that's what she was told? Your Honor, I have to go back on the record to see if there was a that was actually said I don't have that information before me, but it's well within it should be in the brief. Counsel, I believe that was in the recorded conversation that your client recorded on March 7. So but but here's how I understand the timeline. She's told about on March 6, I believe she's told that, hey, the job's no longer there will make you janitor and your son has to leave and you have to take a lower salary. That is confirmed in the phone conversation with Mr. Grizzard. And I think someone else might be on that phone conversation where Mr. Grizzard makes that comment, in addition to saying that he's not going to bat for her because of the meddling, including the thing about the name of the individual that she learned about the rape allegation from. And then seven days later, on the 14th or the 15th, she has read the letter where she now says, OK, we will give you your salary. You can still report to this. We'll give you the original salary. You can still report to the same person, but you must accept these conditions. Is that not the timeline of how this happened? Your Honor, that is a timeline. And your Honor, I want to point to the ex Munoz case where we're talking about the Munoz case dealt with an individual with FMLA and having to sign a letter to say she won't be late to work anymore. She would come to work on time. But Ms. Munoz had health conditions, and this is a case that came out in December last year, health conditions that she could not make that commitment. And essentially, she was told if she don't sign the letter, then she would be terminated. And the issue in the case was whether it was that acknowledgement or if she don't sign the letter, she'll be terminated. But the court's turning on is whether Ms. Munoz had a reasonable subjective belief that if she signed this letter, that she basically relinquished her rights on FMLA. In this case, you have you have seven conditions. It's not even reasonable. It's objectively reasonable when you look at conditions. And in fact, when Ms. Swint did not refuse to sign the letter, she was essentially she was terminated. So when you look at the FMLA rights in Munoz versus the First Amendment rights in this case, I will contend that the First Amendment rights to be continued even to be afforded greater protection. Well, let me ask you about, let me ask you about the context of the letter. So the letter had a bill of particulars first, and then had the conditions, right? Right. And one of those bill of particulars was that bait was based on what she had learned as in her private capacity on the Facebook page, reaching out to her friend, the ex employee, right? Right. And that is then followed by a condition where you can't associate with anyone regarding any even former employee with the with the with the Cultural Arts Center, correct? Correct. So if we're looking at context, do we take into account the fact that the premise for the condition was this conversation that she had, or she learned on Facebook and had on her off time with the former employee? I believe that you can look at a context and say that was a premise. But even further, your honor, I believe the context of this letter was to chill her and prevent her from from actually been a mandatory mandated reporting reporting things that she had learned. How do we decide this as a how do we decide this on summary judgment? Do we view if there are two ways contextually to look at this one way, which is is as Judge Marx asked you about, which is it could be just viewed as employment conditions because she was told seven days earlier, when she was told that her and she had a lower salary, that it was fine for her to associate at lunch, and then later was told something different. When she her salary was popped up, and the thing about her son was taken off the table. But one way to look at is that these are employment conditions. Is there another way to look at this to say, and the light most favorable to the plaintiff, you could look at this as affecting associational rights outside the employment context? Yes, you can. You definitely can look at that in that context for purposes of summary judgment. Because you obviously, you obviously, like you said, your honor, the discussion she had with Mr. Sorry, you're with somebody who's no longer even working for the city at all. This person no longer work for the city. She got his information from Mr. Sorry, yo, she wasn't seeking that information. That information was given to her due to be a mandatory reporter, she had to report the information, your honor. So you looking at the context of summary judgment, I think a jury question is presented as to what's the real animus reason of these conditions? Let me how does this play in and there may not be an answer and you may not know it. So I apologize if I'm asking something that may come out of left field. But how does that play in when when Pickering itself or the ultimate conclusion and Pickering is a matter of law? You know, subsidiary fact questions may be decided by a jury can be given to a jury, but the ultimate conclusion is an issue of law that's decided by the court. How does the summary judgment standard play into that? You know, I think I believe that a summary judgment standard play when you talk about a matter of law in the Pickering, but also, you know, I was I was pointing the courts to Martinez versus city of Opa, LACA, where the courts in the Fifth Circuit is a I'm sorry, not I'm sorry, not that case. But the courts in the Fifth Circuit determined that Wilson versus Taylor Fifth Circuit case in 1981 held that a government employee may not be conditioned upon a relinquish of any constitutional rights, including right of speech and association guarantee on the First Amendment. Understanding that is not binding precedence in this, this circuit. It is from the Fifth Circuit, it was a couple of days after all opinions would have been binding. But when you look at it in that particular context, and what's happening, and the objective belief of objectivity and the subjective relief of Ms. Swick, not that you clear you have a clear condition, your appointments condition on point upon you relinquishing your constitutional rights. And when you look at some other conditions, we're talking about she can't involve herself in legal litigation. She can't talk about a salary. She can't even have any disrespectful comments about elected or public officials. And even the Tim grizzly, the city manager, the polls that they believe they couldn't enforce that. But it's not the fact they believe you can enforce it. It's believed, based on the based on the case, December case, what is course determined so long as you have a subjective belief that if your rights are being relinquished, it is a question for the jury. And we clearly have it here, judge, we clearly have it here. Your time has one other question, chief. What I know in your brief, you present some things that she might be prohibited from doing. Was there any evidence in the record about what she wanted to do, and would have been prohibited from doing? Did she testify at all? I would not be able to do this at church or go to this group or do anything. It was evidence in the brief, and I would look at the briefing of the record that that it was some things that she would testify to that she felt as though that she would not be able to do certain things with past friends that she had at the cultural arts center as well on your honor. But I'll rely on my brief to ask that question. Thank you, Chief. Thank you, Mr Markovich. Yeah, Mr Markovich, you are muted. So I made the same mistake. Uh, may it please the court. My name is Robert Markovich. I represent the Apple ease in this case. That's various individual defendants who are current or former employees of the city of Carrollton and the city of Carrollton. I do want to turn to Judge Lux inquiry. But before I do, uh, I want the court to keep in mind, and I'll return to it that there's a more now and qualified immunity issues. That's an overlay to the substantive consideration of both counts. One hand, and I want to discuss qualified immunity, especially with regard to count one. But if you can address my concerns, that would be very, very helpful to me. Sure. So, um, as Judge Marks noted, and as the court, as you noted to Judge Luck, there's a sort of bill of particulars that precedes that condition. I think the first thing that as the court should consider is what the condition says itself. And with the court's indulgence, I'd like to actually read it because the words, um, speak for themselves. Do not involve yourself in anything associated with the cultural arts center unless you are specifically directed to do so by your chain of command. It is particularly important. You stay out of matters concerning pending litigation, pastor, current employees, volunteers or anyone associated with the cultural arts center. The condition itself has a caveat that she needs to consult with her chain of command before she associates with anybody at the art center. Well, the chain of command is not present in her life as a private citizen, only as a public employee. Now, as to the bill of particulars, as you called it, Judge Luck, yes, there are various events where, uh, in the city's view, she was quote meddling at the cultural arts center where she had previously worked. As to your concern, Judge Luck, that she had seen that Mrs. Asaro had resigned from the city on Facebook. What she was criticized for, though, was what she did with that information at work, not for having seen it on Facebook. So she wasn't even criticized for reporting it because, as my worthy opponent has stated, she felt an obligation to do so. In that bill of particulars, she's criticized for talking about it. If one of the things that one of the bills or the particulars is that she reported this to people she shouldn't have reported it to, which I think is what you're talking about, the two employees that were not in the chain of command, is that not at least contextually the point that she learned this in the context of her of her associational rights? In other words, outside of work, with a friend on Facebook, having a private chat where she learned and then told people about that. In other words, she learned of all this information, which led to what it led to, having nothing to do with her employment. And yet she's being told that she can't associate. So is it not contextually putting those together away, at least for summary judgment purposes, to look at this as this dealt with non associational rights? I believe so. Sorry, non work associational rights. If I recall correctly, she conferred with two of her co employees, I believe, while at work. And her testimony was that she did so to figure out how best to report it up. So it does not implicate what she learned in the Facebook context. The other thing that it implicates, in other words, is what it implicates is what she does with that information in the employment context. Correct, Your Honor, that's exactly right. And the final point, of course, which I believe, Judge Pryor, you may have noted, if not someone else did, I apologize, is that Mr. Grizzard, when she inquired, when they had that taped conversation, he said, well, of course, you could go to lunch with these people. So in on its face, in its context, and in light of what we'll call maybe extrinsic evidence, the only conclusion I think that can be reached is that this was a limitation on her rights as a public employee, not a private citizen. That statement, though, that statement, though, is a little cut off from what ended up happening. So there's seven days between that statement, and the employment context at that moment was, she was told that her job was eliminated, she could take a job with lesser money, but and her son can no longer work there. Yet, seven days later, she's then given really a higher salary, what you were making, I'm sure more than any janitor was making in the entire city, if I had to bet. No mention of her son having to leave. And now there are written signed conditions that if you don't accept, we you will be subject to termination. That seems to be very different than the casual conversation between friends that that that was had between the parties on on March 7, right? Well, I mean, it is a different context. But again, the starting point is the condition. The discussion with Mr. Grizzard, although it preceded it, is part of the context in which that condition was presented to what about the statement, if we're looking at that conversation as playing under this for summary judgment purposes? What about the statement that I'm not going to bat for you, because of your meddling, including this situation with thing that you did to me? Or you that you did? Well, I mean, that is undeniably was stated, correct? It was undeniably stated. That's true. But I don't think that has anything to do with her right as a right of association as a private citizen, except that the only way that she meddled in the context of the rape was in learning about what what happened on a private time. But the meddling to the that's what we're gonna call it meddling isn't learning is it is the meddling learning or is the meddling what you do with the information afterwards and the contacts? That's exactly my point. Your honor, Mr. Judge prior moving to the qualified immunity. If there's no further questions on that, um, first of all, there's a manel. I may I may have a couple more questions. Here's what Here's a summary. I don't I don't have the word for word right in front of me, but I have the summary of it. So on March 7th, uh, Grizzard, Mr. Grizzard told the plaintiff that he quote he was not going to bat for her to save her position because she kept meddling with the art center. And then he later brought up quote that stuff with a sorry with the former employee. Um, that stuff is not just meddling. That stuff is what she was told and what happened when she reported it, right? At least I was favorable to the plaintiff. But my answer would be the same, though. Sorry, is the person from whom she learned this information. It's what she did with the information. That's that issue. But he says that stuff with her. Not that he doesn't mention the meddling that in that sentence, does that stuff with her? Well, I mean, I think the inference would be that what he was talking about was the report of the rape that she learned about this alleged rape and that she then discussed it with two of her co employees about how to raise it up the chain. And I believe it's the same context. You're on it. Would this be different if she had just gone straight to the police versus she's the one who put it in an employment context by instead of reporting it to the police what she learned on her private time. She went through the chain of command at work. So if if there were retaliation for her going straight to the police, I'm not saying this was retaliation in any of that. But if there were retaliation, then it would be a different circumstance. But this is all in the context of what she did at work. Judge like, I think you had another question. Not at the moment. Okay, so going to qualify. I mean, let's first let's start with Manel. Um, now the Manel holding and this may have been where you were going. Judge Luck is in footnote three of the summary judgment order. Yeah, but that because the trial court is specific for Manel with regard to count to correct. But nevertheless, I agree with you, Your Honor. Same with qualified immunity. That was the whole thing. Those both relate to count to. Nevertheless, and I don't want to spend too much time on it. The court was the record still supports a finding that Manel in qualified immunity applied account one. It was essentially for want of a better word, right for any reason. And as to Manel, of course, there's two prongs to Manel in terms of showing an official policy that was violated. One, there has to be an official city policy. Well, there was no official city policy put an issue and, uh, appellant hasn't stated as such. The second, and I believe this is where Mr Daniels has emphasized in his briefing is the fact that there can be a single action by a final policy maker who is designated as the policymaker under state law or local ordinance. That's Pembower Supreme Court plurality decision and a city of ST plurality decision. The plaintiff, the appellant has made no showing. It is true that Mr Grizzard was the final decision maker on hiring and firing in the city of Carrollton, except as to the city attorney. However, there's been no showing whatsoever as to who or what was the final policymaking body or person in the city of Carrollton for summary judgment purposes. Council, if you, if you represent, I mean, this is a city manager run government as opposed to a strong mayor sort of government where you have that sort of government where the city manager is in charge of all employees and specifically hiring, firing in the budget. How is that not, at least for summary judgment purposes, sufficient to show that he had final decision making authority and final policymaking authority with regard to the employment decision here? He wrote the letter. It's undisputed. He was the one who decided this. And he was the one who made the decision to ultimately fire her out. How is that not enough for summary general purposes? Well, the burden is on the plaintiff to show who the final policymaker is. Right. I just, I just laid out what the evidence is. So they presented that evidence. Why is that not on summary judgment, at least enough for reasonable inference that Mr. Grizzard was the final policymaker? Because it's a matter of law under Georgia law or municipal ordinance. And the Supreme Court made that point in footnote 12 of Pembauer. It took the example of a sheriff in, let's read that footnote. It says, for example, the county sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. Right. But this wasn't an employment policy. This was a specific employment decision made with a specific employee. We agree. There's no policy that any other janitor can associate with anyone at any time, anywhere regarding the Cultural Arts Center. It's only regarding this employee. And that decision was made by Mr. Grizzard. I have a hard time understanding how for summary judgment purposes, why we're not there. But what I'd like for you to talk about with your remaining time is the qualified immunity issue with regard to the let's assume for the moment that I think, at least in context for summary judgment purposes, that this infringes or encapsulates more than just employment associational rights, that it goes outside the employment context. How do you win, even if I agree with with the plaintiff on that position under a qualified immunity analysis? Well, the problem with the qualified immunity is that it goes outside the employment context as to a violation of a clearly established constitutional right. That's her burden under qualified immunity. Defense has the burden. She says it's my associational right. I have the right to associate with people socially. And this letter infringes on that. She has to show with reference to law that it was a clearly established right. And she did not do that. It's not in her summary judgment brief. Uh, do you think it's a matter of waiver? Well, it is at least as to count two. And then I tend to agree, but I'm talking about as to count one right now. Well, in count one again, same thing, right? For any reason, the same record supports a finding as to count one. Yeah, but is it a waiver issue or is it a record issue? What? What? Sorry. Sorry. As you're right as to count two, it's an abandonment slash waiver as to count one. It's right for any reason. And what would that reason be that she failed to make any showing of a violation of a clearly established failed to explain it is what you're saying, right? Yes, she was. She was obliged to explain how it was a clearly attempt to do so. Correct. Your honor. Uh, list. There's any further questions. Your honors will rest on our braids. Thank you. Okay, Mr Daniels. You've got three minutes for rebuttal. Thank you. Just prior to the male issue. Um, it's clear case law out of the 11th Circuit. It speaks directly to the Monell concerning issue. Actually, 2000 1992 case Martinez versus City of Opa. I think that's when I was referring to earlier, finding that the final final policymaking authority with a city managed decision to hire a fire administrative personnel is completely insulated from review. Basically, he's a policymaker. If he has that authority to see the Carrollton, he clearly has the authority. It is a type of city that's controlled by the city manager. In fact, Mr Grizzard, he in fact wrote the letter. He dropped the letter. He wrote the letter. He present the letter. So he completely was a salary. That's not right. Excuse me, Mr Daniels. Okay, go ahead. We go. All right. Okay. And, uh, your honor, as it relates to, your honor says relates to the qualified immunity issue. We, in fact, in our brief talked about law being clearly established inside our, uh, brief and summary judgment response to, uh, the city's motion for summary judgment. In fact, that's what I was referencing to the, uh, the case is still about the Fifth Circuit. I don't see anything in the reply. I don't see anything in the reply brief, though, regarding, um, qualified immunity. Um, so as I understand what happened here is, uh, you made your argument on in the answer brief. Um, they, the, uh, counsel for the individuals stated that, uh, even though the court didn't rule on it for count one, it would be right if they did rule, we ruled on qualified immunity, uh, for appellate purposes because it was preserved. And then in the reply brief, there's no real answer to the qualified immunity issue. So do we have a, an abandonment waiver forfeiture issue with regard to qualified immunity? Well, yeah, I'm sorry. In the context of our brief, we're clearly talking about a right being clearly established, uh, at the top now as relates to a qualified amendment argument. But as well as you know, Judge Prior, uh, in your opinion, uh, as you wrote in, uh, in, uh, Jefferson versus C1, the correct legal standards never weighed so long as this is within the brief. And it's clearly within the brief that we're talking about. She has a fourth amendment right. This right was, was violated as a rate, as it relates directly to the individuals. I'll concede that it's not in there, but for the context of this course to consider it, it is within our brief. So for qualified immunity, the burden, once, once they establish as a the burden then shifts, uh, to the, to the plaintiff, um, to then show that it's clearly established that there, in other words, there was actually a violation and that that violation was clearly established. If that burden isn't met, um, in, in the, in, in the briefing or isn't even argued, um, I'm just concerned that there might be some sort of a forfeiture waiver on the qualified immunity issue, but, um, well, obviously we'll take a closer look at that. And we'll try to understand, you know, our position is definitely that the tax through the city manager's position, they are responsible. Uh, they should be held responsible for their acts. Uh, you're on the last thing that I would say that the courts talk about the Georgia whistleblower act, and I know it's a state claim and talk about no temporal proximity as this course point to, it is a recording of Mr. Bridges telling Ms. Swint that, Hey, because of this stuff, dealing with the Colasario, and this is the stuff talking about the rape allegations, uh, I'm not going up the bat for you. So we believe we have the right evidence in the temporal proximity. You talk about five weeks, the district courts talked about that. The temporal proximity wasn't met in the case. We cited was a case where I thought the district court and everyone sort of agrees that there's a prima facie case. The question really is on pretext. And the law, as I understand it, both in Georgia and here is that, uh, it's not enough just to show proper temporal proximity. You have to show something more than that, um, to show a pretext. That's correct. But we're talking about direct, even in a simple proximity, you're talking about a casual, casual, causal link. We have direct evidence here, and that's why we move for motion summary judgment on the whistleblower, as well as the first amendment, because we believe the objective evidence of the letter and the recordings is clear that Mr Grizzard retaliated against Miss Swint because she engaged in protective activity. Uh, and that's why we move for motion summary judgment. Okay, we understand your case. Thank you, Mr Daniels, and we'll move to our third case. Thank you.